[No. 13103.  Department Two.  November 22, 1916.]

MICHAEL J. REYNOLDS, *Respondent*, v. HARRY L. DAY *et al.*,
*Appellants.*[1]

RELEASE—VALIDITY—FRAUD — EVIDENCE — SUFFICIENCY.  To over-
come a release of damages, fraud, false representations or overreach-
ing must be established by clear and convincing testimony; and the
evidence is insufficient, where it appears that an intelligent miner,
who had had some schooling, and knew the company owed him noth-
ing, signed a release which was read over to him, and accepted
money which he knew the company would be paying only in settle-
ment of any claim he might have for damages, and his claim that
he could not understand the meaning of such words as "injury,"
"liability" and "settlement" and that he thought he was receiving
"wages" is not substantiated by the record.

Appeal from a judgment of the superior court for Spokane
county, Sullivan, J., entered June 8, 1915, upon the verdict
of a jury rendered in favor of the plaintiff, in an action for
personal injuries sustained by an employee in a mine.
Reversed.

*John H. Wourms, Plummer & Lavin,* and *Graves, Kizer &
Graves,* for appellants.

*Robertson & Miller* and *Corkery & Corkery,* for respondent.

MAIN, J.—The purpose of this action was to recover dam-
ages for personal injuries.

One of the defenses pleaded in the answer was a settle-
ment and written release.  The signing of the release is not
controverted, but it is claimed that it was induced by fraud.
The trial resulted in a verdict and judgment for the plaintiff.
From this judgment, the appeal is prosecuted.

The facts which present the controlling question are these:
On August 10, 1912, the respondent, while working for the
defendants in the mine owned and operated by them at Burke,
Idaho, sustained a serious injury to his feet and ankles by

[1]Reported in 161 Pac. 62.

falling down a chute in the mine. At this time, the respondent had been at work in the mine about two weeks. After the accident, he was taken to a hospital at Wallace, Idaho, which was conducted by Dr. M. T. Smith. The respondent remained in the hospital approximately twelve weeks. The mine was operated under the name of the Hercules Mining Company, with offices in Wallace.

After the respondent had been in the hospital about ten weeks, and was able to leave the hospital and go about town on crutches, he went to the office of the manager of the company, and while there, discussed with the manager his injury, and the question as to who was liable therefor. He took the position that the company was to blame, and the manager took the opposite position. After talking with the manager for a time, he left the office and returned on October 21, 1912, when again he and the manager discussed the same questions as on the previous visit. On this date an agreement was entered into as follows:

"This agreement between John Reynolds, party of the first part, and the Hercules Mining Company, party of the second part, recites the following condition:

"Whereas, John Reynolds was injured in the Hercules mine by falling down a chute in the said mine, and whereas there is no blame or negligence attached to said company for this injury; the said company as a matter of grace gives John Reynolds time from the tenth day of August to the present date inclusive at the rate of ($3.50) three dollars and fifty cents per day, paid to him in hand this 21st day of October.

"The above named company further agrees to allow the above named John Reynolds three (3) months' wages at the rate of ($3.50) per day payable at the Hercules Mining Company's office, Burke, Idaho, on the tenth of each month thereafter. At the end of this time John Reynolds is to report for work, if he is unable to work at that time the company will allow him two months' additional wages at the above named rate ($3.50) three dollars and fifty cents per day.

"For this consideration, the said John Reynolds has accepted this amount in full settlement for any claims of per-

sonal injury, which he might have upon the above named company.                              John Reynolds.
　　"C. C. Richlie, Witness."

On the same date he was given a check for $255.50, and signed the following voucher:

　　　　　　　　　"Burke, Idaho, October 21, 1912.
　　　　　　"Hercules Mining Co., Dr.
　"Check No. 961　　　　　　To John Reynolds,
　　　"1912.　　　　　　　　　Burke, Idaho.
　To Settlement——for injury to——(John Reynolds)
　in Hercules Mine, Burke, Idaho, i. e.——
　Time as follows:
　　August 22 days at $3.50 per day. . $77.00
　　September 30 days at $3.50. . . . . . 105.00
　　October 21 days at $3.50. . . . . . . .　73.50　255.50
$255.50　　　　　　Wallace, Idaho, Oct. 21, 1912.
　Approved:　　　　　Received payment in full for above
　[Signature illegible.]　amount.
　　　Gen'l. Manager.　　　John Reynolds."

On November 1, 1912, the respondent again appeared at the office of the company and requested the manager to advance him sixty days' wages. The respondent desired this money so that he might make a trip east and consult Mayo Brothers, at Rochester, Minnesota, relative to his feet. At this time a memorandum was signed by the respondent which referred to "the former agreement between the Hercules Mining Company and myself," and acknowledged receipt of sixty days' wages before the same would be due under the release signed on the 21st of October. On the same date, the respondent signed a voucher like the one above set out, which stated: "To settlement for injury: 60 days at 3.50 per day, $210." A check for this sum was then given him.

After receiving this check, the trip to see Mayo Brothers was made. Some time after January 1, 1913, the respondent returned to Wallace. On January 29, 1913, he received from the company a check for $105 and signed a voucher, which stated: "To December wages—30 days at $3.50.

Amount allowed account injury received in Hercules mine, $105."

Some time after this, and probably during the early part of March, the respondent went to Spokane to consult Dr. C. F. Eikenbary. Not at that time having money to bear the expense of the trip, Dr. Smith advanced him $50, after consulting with the manager of the company and being assured that the company would pay the same. Dr. Eikenbary operated upon the respondent's feet, and was paid therefor by the company the sum of $150. After so far recovering from the operation performed by Dr. Eikenbary as to be able to be about on crutches, the present action was instituted.

Since the case is controlled by the settlement and release, a statement of the facts bearing upon other phases of the controversy would be immaterial. After a statement of the law by which the validity of the release is to be determined, a further reference to the facts will be made.

Releases of this kind are like any other writing and are not to be lightly overcome. If they are not induced by fraud, false representations, or overreaching, they must be sustained. The testimony to sustain the charge of fraud must be clear and convincing. *Nath v. Oregon R. & Nav. Co.*, 72 Wash. 664, 131 Pac. 251; *Mattson v. Eureka Cedar Lumber & Shingle Co.*, 79 Wash. 266, 140 Pac. 377; *Spratt v. Northern Pac. R. Co.*, 90 Wash. 592, 156 Pac. 563.

The respondent claims that, at the time he signed the release, he was told by the manager of the company that he would be well in two months, and that he thought he was simply receiving wages. He admits that he knew at this time that the company owed him nothing for wages, the amount which he had earned prior to the injury having been previously paid. He also admits that, for the money which was paid pursuant to the release, the company received no benefit. He also admits that, prior to the signing of the release, some paper was read to him, but says that he does not know whether it was the one he signed or not. The manager of the

company and the stenographer both testified that the release was dictated in the respondent's presence, and was afterwards either read to him by the manager or that he read it himself before he signed it.

As to the vouchers which he signed, the respondent says that he did not read them, and that if he had, he would not have known the meaning of the word "settlement." He also testified that he would not have known the meaning of the word "injury," or "liability" as used in the release. He claims that, at this time, he was feeling much broken up, and that his head was "going around." The respondent had had some schooling; was able to write letters and read the replies which he received thereto from his relatives; and was able to read the newspapers to some extent, but did not understand the meaning of "big words." Although he testified that he was unable to understand such words as "injury," "liability," and "settlement," yet he was an unusually adroit witness. He speaks as correctly as the average witness, if not more so.

Some reference is made to the claim of the respondent that Dr. Smith told him he would be all right in two months. But whatever Dr. Smith may have said, he was not employed by the company, but by the men in the mine, and his statements would not be binding upon the company, even assuming that the statement of the physician, if relied upon, would be sufficient to impeach the release.

The respondent left his home in Ireland when fifteen years old, and went to Scotland, where he remained four years. Then he came to Philadelphia, and from there to Massachusetts, where he had a brother or brothers. After working in Massachusetts for a time, he went to Pennsylvania, where he worked in a mine. Subsequent to this, he worked in a number of different states at such work as mining, teaming, and carpentering. Before he went to see Dr. Eikenbary, as he says, Dr. Smith told him that he had signed a release. But as Dr. Smith testified, it was the respondent who told him that he had settled with the company. Whoever may be right

as to this, the fact is that, after this conversation, the respondent received the $50 which Dr. Smith advanced after being authorized to do so by the company. Under the evidence, it cannot be found that the respondent thought he was receiving wages, because he admits that he knew no wages were due him. It cannot be said, at least when he received the payment on January 29th, that he relied upon the assurances of the manager of the company—assuming that he had a right to rely upon such assurances that he would be well in two months—because at this time much more than two months had elapsed, and he had been back to see Mayo Brothers, and had received some treatment from them, and knew that his injury to some extent was permanent. The only reason the company would be paying him this money was in settlement of any claim he might have for damages. And this fact must have been known to him.

Taking into consideration all the facts in the case as stated, as well as other details not stated, the only conclusion to be arrived at is that the evidence in this case by which fraud or overreaching is sought to be sustained, is far from clear and convincing. If, under the facts in this case, the release can be impeached, it is difficult to see how it would be possible for a release in any case to be sustained.

A number of cases from this court have been cited by the respondent. Without reviewing these in detail, it may be said that, after a careful reading of all of them, it appears that each of the cases relied on is clearly distinguishable in its facts from the present case. Where a release is sought to be impeached for fraud, every case must depend to a large extent upon its own facts.

The judgment will be reversed, and the cause remanded with direction to the superior court to dismiss the action.

MOUNT, HOLCOMB, and PARKER, JJ., concur.